Filed 9/4/24  P. v. Francis CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B329384 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. BA454480 |
| v. | |
| TYREE FRANCIS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Karla D. Kerlin, Judge.  Affirmed.

Sharon Fleming, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Wyatt E. Bloomfield and Stephanie Yee, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Tyree Francis unsuccessfully tried to dismiss parts of his criminal case before trial.  He also unsuccessfully sought mental health diversion.  He ultimately agreed to a no contest plea and 19 years in prison.  Then he appealed.  His appellate counsel found no arguable issues and filed a brief under *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*).  We ordered briefing related to mental health diversion and now affirm.  Undesignated statutory citations are to the Penal Code.

I

First we draw from the preliminary hearing transcript to summarize the underlying incidents.  Then we trace the relevant procedural history of the case.

A

On a rainy day in February 2017, police spotted a white Mercedes with dark tinted windows and paper plates at a gas station on the corner of Slauson and Crenshaw.  When one of the officers walked to the car, the driver quickly reversed and sped out of the lot into oncoming traffic.  Police pursued the Mercedes, which sped through red lights on wet roads going more than 100 miles per hour in a 35-mile-per-hour area.  The police fell behind and eventually lost sight of their target.  They went back to the gas station to get surveillance video of the incident.

The next afternoon, different officers who had been briefed on the incident saw the same Mercedes get onto the 110 Freeway.  They pulled behind it.  The driver (Francis) accelerated, cut across the freeway lanes, and again topped 100 miles per hour as he swerved through moderate to heavy traffic.  The officers trailed him with their siren on and lights flashing.

After the police briefly lost sight of the Mercedes, the chase continued on surface streets in downtown Los Angeles.  Francis

pulled into a parking structure, crashing through the crossing arm at the entrance and nearly hitting garage employees inside the structure.  One employee saw the driver throw a small black object out of the car.  The object was a gun.

Francis left the parking structure and pulled into an alley.  He rapidly accelerated his car towards the police who pursued him on foot.  One of these officers fired one shot at the Mercedes as it sped towards him and got within a couple feet.

Francis sped out of the alley and continued evading police.  He drove on the wrong side of the road, in a turn lane, and through at least one red light.  The chase ended after the Mercedes crashed into several cars, flipping one onto its side and badly injuring the driver.  This was in a residential area near a school.  Francis was going more than twice the speed limit.

Police recorded nearly all of this chase.  They tied Francis to the earlier chase using the gas station surveillance video.

B

A May 2018 information charged Francis with 11 counts arising from the two car chases.  The information included various enhancements and asserted Francis had two or more serious or violent felony convictions.

After various delays, Francis hired private counsel, who moved to dismiss the allegations and enhancements based on several special directives by the District Attorney.  The trial court denied the motion.

In July 2022, new private defense counsel filed an omnibus motion for relief under various ameliorative laws.  The motion sought dismissal of enhancements and prior strike allegations under amended section 1385 and the Racial Justice Act (section

3

745), requested mental health diversion (section 1001.36), and alternatively asked for an indicated sentence.

Francis supported his motion with a psychosocial evaluation by social worker Regina Robles and with a report by trauma specialist Dr. Kevin E. Booker. The thrust of Robles's report was Francis's actions in February 2017 were connected to his post-traumatic stress disorder (PTSD) from having several childhood friends die from police violence, his young age (24 at the time of these offenses), and the childhood trauma he experienced with a drug-addicted mother, no father, and consistent police harassment. Booker diagnosed Francis with moderate chronic PTSD, recurrent major depressive disorder, and complicated bereavement.

The prosecution opposed Francis's motion. It argued Francis had a documented history of putting members of the public at great risk of death in a consistent effort to avoid arrest and responsibility, his conduct was not the result of a mental disorder, and his early release would endanger public safety. The opposition emphasized Francis's earlier manslaughter conviction: In 2013, shortly out of prison for another offense, Francis killed a 72-year-old man while speeding to pass a car and veering into oncoming traffic. Francis fled the scene while the man lay dying and while Francis's two passengers were trapped in his car. He was not arrested for this crime until after "yet another vehicle pursuit with the police" later in 2013.

Before hearing Francis's omnibus motion, the trial court asked Francis to submit a viable treatment plan with an updated expert report explaining whether Francis satisfied the requirements of section 1001.36. Booker provided a two-page supplemental report concluding Francis was a feasible candidate

4

for mental health diversion.  Booker observed:  "While there is no *absolute* correlation between [Francis's] actions and his chronic mental illness, the exhibited behavior in this case is most consistent with the hyperarousal we see in chronic PTSD." "*Clinical data suggests that his* Post-traumatic Stress Disorder *is clinically significant and it appears evident that this destabilized, mental disorder played a role in the commission of the offense in this case*."  Booker noted that unless people like Francis "receive targeted, therapeutic treatment, the chances of disinhibited, asocial behaviors increases."  "*Therefore, a Mental Health Diversion referral would reduce his chances of re-offending* **PROVIDED IT IS SPECIFIALLY** [sic] **TARGETED for Post-traumatic Stress Disorder treatment.  *A Mental Health referral in this instance would likely not pose a risk of Mr. Francis committing a super-strikable offense if he remains compliant in trauma-focused treatment.*"  The emphasis is Booker's.

Francis also provided a Conditional Letter of Acceptance to a "residential recovery home for chemically dependent and/or dual diagnosed clients."  The letter referred to Francis's "addiction" but said nothing about PTSD or PTSD treatment.

The trial court let both sides argue at the January 25, 2023 hearing.  But first, the court "set the stage" for the motions before it.  The court recited the documents it had reviewed and key facts about the two police chases at issue.  It explained some of Francis's criminal history:  Francis had three strikes for three separate residential burglaries in early 2013—around the same time as the vehicular manslaughter—and he had been on parole for just five months at the time of the offenses here, in February

5

2017. The court found the facts of the manslaughter case significant and observed no police were involved in that incident.

Regarding mental health diversion, the court acknowledged Francis's PTSD diagnosis but noted this was a "lower level mental health issue" that would not qualify him "for a bed in the lockdown even if one were available." The judge discussed her familiarity with mental health diversion—having been the Office of Diversion and Reentry judge for five years. She mentioned her efforts "to get as many people out of custody as possible and into treatment." She also acknowledged, multiple times, the law on mental health diversion recently had changed, and there now was a presumption favoring diversion.

The court ruled as follows:

"I do find the Defendant is charged with an eligible offense and has been diagnosed with an eligible mental disorder.

"I find the analysis fails on factors two and six. Factor two is now the presumption that the mental disorder was a significant factor in the commission of the charged offense. In other words, there has to be no clear and convincing evidence that it was not a motivating factor, a causal factor, a contributing factor to the Defendant's involvement in the alleged offense.

"I find that there is, in this case, is no clear and convincing evidence that the disorder was a motivating factor, a causal factor, or contributing factor to the Defendant's involvement in the charged offense in this case.

"I find it very significant that on February 7, he fled from the police without there being any police contact and again on February 8 of 2017 with a handgun in the vehicle. He again fled from the police. [¶] . . . [¶]

6

"The sixth factor is the next factor that I find is not satisfied and that is whether the defendant will pose an unreasonable risk of danger to the public safety as defined in the 1170.1(a) which allowed the People overlook the risk of committing a super strike, and I believe that in this case he actually is.

"I do believe he [poses] an unreasonable risk of danger to the public safety if treated in the community, and it would be a risk of committing a super strike.

"He's engaged in extremely dangerous driving on three occasions, two of which were after an event that resulted in the death of a 72-year-old man at the hands of the Defendant. That was in the event that did not involve police contact whatsoever.

"The Defendant has shown a complete and total disregard for the safety of others in the manner in which he has driven. The events in the current case have resulted in very serious injury to another human being yet again.

"Despite having been convicted for felon with a firearm and vehicular manslaughter, he is alleged to once again be driving with a handgun in the vehicle.

"And lastly, even if he could be safely treated in a lockdown facility, those facilities do not exist in LA County. There's a 120-bed facility that is always full. Those are reserved for seriously mentally ill defendants, not someone who suffers moderate chronic PTSD. Therefore, that is an unrealistic option.

"For that reason, I find the defense has not made a prima facie showing, prima facie showing that he is eligible and suitable for diversion."

Apart from mental health diversion, the court struck two one-year prison priors. It otherwise denied relief. The court observed many of the grounds were premature and, accordingly,

made many of its rulings without prejudice to Francis raising the issue again at sentencing, should a jury convict him. Defense counsel acknowledged the court had given her leeway in hearing the motions then rather than waiting until after trial.

Instead of going to trial, Francis reached a plea agreement with the prosecution and pleaded no contest to four of the 11 counts. He admitted one strike, an allegation of great bodily injury, and two aggravating factors. In line with the plea agreement, the trial court dismissed the remaining counts, struck one strike, and sentenced Francis to a total term of 19 years in state prison. The court imposed no fines or fees.

C

Francis received a certificate of probable cause and appealed the denial of his pretrial motions. We appointed appellate counsel, who filed a *Wende* brief raising no issues.

After examining the entire record, we asked the parties to brief the following issues:

1) Whether the grounds given for denying pretrial diversion at the prima facie stage were proper under the version of Penal Code section 1001.36 then in effect.
2) Whether any error in this ruling was harmless because it is clear the court would have exercised its discretion to deny diversion regardless.
3) The proper disposition here.

The parties briefed these issues, and we resolve the pretrial diversion matter now.

II

The trial court supplied three grounds for its diversion ruling: (1) Francis inadequately tied his disorder to his offenses; (2) he posed an unreasonable risk of danger to public safety if

8

treated in the community; and (3) the proposed treatment plan was unrealistic.  Both sides acknowledge the court erred on the first ground.

Below we explain the diversion statute and the error.  Next we show that this error was harmless, and that remand is unnecessary because the second and third grounds are valid.

A

In 2018, the Legislature created a pretrial diversion program for criminal defendants with diagnosed mental health disorders.  (*Sarmiento v. Super. Ct. of San Diego County* (2024) 98 Cal.App.5th 882, 890 (*Sarmiento*).)  In 2022, when Francis filed his motion, the relevant statute listed six criteria defendants needed to meet to be considered for diversion.  (See *id.* at p. 891.)

Effective January 1, 2023, a few weeks before the ruling on Francis's motion, the Legislature amended the statute by dividing the six criteria into two eligibility requirements and four suitability requirements.  (See *Sarmiento*, *supra*, 98 Cal.App.5th at pp. 891–892.)  "Defendants are eligible if they have been diagnosed with a recognized mental disorder that was a significant factor in the commission of the criminal offense with which they are charged.  ([§ 1001.36], subd. (b).)  They are suitable if:  (1) in the opinion of a qualified mental health expert, the defendant's mental disorder would respond to treatment; (2) the defendant agrees to waive their speedy trial rights; (3) the defendant agrees to comply with treatment requirements; and (4) the defendant will not pose an 'unreasonable risk of danger to public safety' as defined in sections 1170.18 and 667, subdivision (e)(2)(C)(iv). (§ 1001.36, subd. (c).)"  (*Id.* at p. 891.)  The last factor requires courts to consider whether a defendant likely will commit a super strike offense.  (*Id.* at pp. 890 & 897.)

9

Under the amended statute, defendants generally are eligible for diversion if they have been diagnosed with a recognized mental disorder. (*Sarmiento*, *supra*, 98 Cal.App.5th at p. 891.) Unlike the 2022 version of the statute, "the amended statute creates a presumption that the defendant's diagnosed mental disorder was a significant factor in the commission of the charged crime." (*Ibid.*) Courts now must find a causal connection unless there is clear and convincing evidence the disorder did not motivate, cause, or contribute to the crime. (*See ibid.*)

The trial court acknowledged the new presumption favoring diversion. But it incorrectly flipped the presumption in concluding Francis had failed to mount clear and convincing evidence tying his offenses to his disorder. This was error. But it was harmless, and we need not determine whether the court would have exercised its residual discretion to deny diversion regardless, because the court provided other valid grounds for its decision, as we explain next. (See *People v. Watts* (2022) 79 Cal.App.5th 830, 837 (*Watts*).)

B

We uphold the denial of a request for diversion if there was a valid ground for the decision. (*Watts*, *supra*, 79 Cal.App.5th at pp. 832–833 & 837.) That is the case here, where the trial court separately ruled Francis was unsuitable for diversion due to the risk he posed to public safety. (See *People v. Bunas* (2022) 79 Cal.App.5th 840, 860 (*Bunas*) ["a trial court may deny a motion for diversion on the basis of *either* suitability *or* eligibility"].)

The trial court appropriately recognized that this factor required it to determine whether Francis was likely to commit a super strike offense—a narrow category of felonies encompassing any homicide offense. (See *Sarmiento*, *supra*, 98 Cal.App.5th at

10

pp. 890 & 892, fn. 4.)  From the facts of Francis's latest two car chases, plus the fact of Francis's earlier vehicular manslaughter, the trial court reasonably could infer there was a significant risk Francis would kill another person while driving recklessly.  (See, e.g., *People v. Moore* (2010) 187 Cal.App.4th 937, 939 [upholding implied malice murder conviction where the defendant raced through city streets at excessive speeds, ran a red light, and collided with a car that killed one victim and seriously injured another]; see also § 1001.36, subd. (c)(4) [when ruling on this factor, the court "may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's treatment plan, the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate"].)

Francis concedes the record "arguably" supports this ruling. He also concedes implied malice murder was a potentially applicable super strike offense.

Denying mental health diversion based on this suitability factor fell within the trial court's broad discretion.  (See *People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1147 [appellate courts review diversion rulings for abuse of discretion and related factual findings for substantial evidence].)

Francis maintains *People v. Brown* (2024) 101 Cal.App.5th 113 (*Brown*) shows this case should be remanded for a new eligibility determination and for reconsideration of Francis's suitability for diversion.  *Brown* is distinguishable.  There, the trial court ruled on mental health diversion *before* the 2023 change in the law, and the appellate court concluded this pre-amendment ruling fell within the court's discretion.  (*Id.* at pp. 117–119, 121–124.)  The appellate court went on to address the

11

retroactivity of the statutory changes and forfeiture arguments, and it determined remand was required to analyze the defendant's diversion request under the amended statute. (*Id.* at pp. 117 & 125–128.) In a final few sentences, the court rejected the prosecution's argument that remand was unnecessary because there was a valid ground for upholding the diversion decision, as the record did not clearly show the trial court would reach the same conclusions about eligibility or suitability under the new law. (See *id.* at p. 128.)

Here, the law had changed by the time the trial court ruled, the court was aware of the change, but the court applied part of amended law (the presumption) incorrectly. The court's treatment of Francis's continued risk to society under the amended law was sound. Redoing the eligibility and suitability analyses is unnecessary. (See *Bunas, supra,* 79 Cal.App.5th at p. 860 [because a court may deny a diversion motion based on either suitability or eligibility, "if the court determines that the defendant or offense is *not* suitable, it makes no difference whether the defendant is *eligible*"].)

C

Separately, the trial court's denial of diversion based on the proposed treatment plan was sound.

Not only must a defendant be both eligible and suitable for mental health diversion, but the trial court also must be satisfied the recommended mental health program will meet the specialized needs of the defendant. (§ 1001.36, subd. (f)(1)(A)(i); see also *Sarmiento, supra,* 98 Cal.App.5th at p. 892 [this subdivision contemplates "an ongoing assessment to assure that defendants will receive appropriate treatment for their particular conditions as part of the diversion program"].)

Francis's reply brief does not respond to the prosecution's arguments on this point.

Francis's diversion motion noted his condition qualified him for a particular long-term locked care facility in Los Angeles County (Olive Vista Behavioral Health Center). The motion said nothing about the center's ability or inclination to accept Francis. The court noted its experience with these facilities was that they were always full and were reserved for those with significantly more serious conditions. No one refuted this.

Instead, Francis's supplemental diversion materials pointed to a different residential facility that eventually would have space for Francis. This letter said nothing about PTSD or trauma-focused treatment. Accordingly, nothing assured the court the facility could provide the intensive focused therapy Booker maintained Francis needed to reduce his chances of reoffending.

Denying mental health diversion under these circumstances was not an abuse of discretion. (See *Sarmiento, supra,* 98 Cal.App.5th at p. 895 [under subdivision (f)(1) of the diversion statute, "a court might reject diversion if it concluded that the proposed treatment services did not target or could not effectively address the defendant's particular diagnosis"].)

### DISPOSITION

We affirm the trial court's orders and the judgment.


WILEY, J.

We concur:


STRATTON, P. J.          VIRAMONTES, J.

13